UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence Ray YANT, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Luther Curtis DUCKWORTH, Defendant-Appellant.

Nos. 17165, 17166.

United States Court of Appeals
Sixth Circuit.

Feb. 3, 1967.

Arthur L. Brooks, Jr. (Court-appointed), Lexington, Ky., for appellants.

James F. Cook, Asst. U. S. Atty., Lexington, Ky. (George I. Cline, U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before O'SULLIVAN and EDWARDS, Circuit Judges, and BATTISTI,* District Judge.

EDWARDS, Circuit Judge.

Appellants Yant and Duckworth, along with another defendant named Decker, were charged with robbing the United States Postmistress at Barrier, Kentucky, and putting her life in jeopardy by the use of a dangerous weapon, in violation of Title 18 U.S.C. § 2114 (1964). All three were convicted after a jury trial and sentenced to mandatory sentences of 25 years.

Appellants contend on appeal that prejudicial error was committed at their

* Honorable Frank J. Battisti, United States District Judge for the Northern District of Ohio, sitting by designation.

trial by the admission of evidence seized at the time of their arrest in violation of their Fourth Amendment rights. Testimony pertaining to the claimed illegal search had been taken by the trial judge outside the presence of the jury. It disclosed that after the robbery of the Denneys in their home at Barrier, Kentucky, which resulted in the removal of a fishing tackle box full of property pertaining to their Barrier, Kentucky, post office, warrants for armed robbery had been issued for four people, including the two appellants herein.

The Postal Inspectors had information that Decker, the owner and driver of the automobile involved in this case, lived in Indianapolis, and a Postal Inspector named George A. Freeman called the Indianapolis police to ask their cooperation in watching for Decker's car. Freeman's testimony out of the presence of the jury before the United States District Judge follows:

"A. I gave the Indianapolis Police Department the information concerning the car, the names and descriptions, physical descriptions of the purported occupants of this car. I furnished them the information that warrants had been issued in Wayne County, Kentucky, for the arrest of these people, charging them with assault and armed robbery. I advised them through Captain Jack Quatman and Lieutenant Tom Cline, who were in charge of the tour of police officers that would report for duty at 11:00 P.M. Again this was on the night of January 13, 1965. The Postal Inspectors at Indianapolis had kept Mr. Decker's home under surveillance. His wife was at the home of her parents, Mr. and Mrs. Barton, on North Butler there in Indianapolis. We had that under surveillance. I was patrolling Massachuetts Avenue between that place and the bar operated by Charles Yant, the defendant Yant's brother. At approximately 3:40 A.M. on the morning of January 14th I was traveling southwest on Massachuetts Avenue, which is toward town from

Decker's residence, and I saw the police cars had some car stopped at a service station at 4105 Massachusetts Avenue. And as I approached, I recognized that it was a 1957 Black Dodge. I pulled into the service station, where I met Lieutenant Tom Cline, and I saw that he had several prisoners, one in each of three cars. He advised that this was the car and that he had just arrived at the scene, that they had just been stopped, oh, ten minutes maybe before. He wasn't exactly sure of the time. And the police officer who actually made first contact had started a search of the car and had removed—

"Q. 9. Were you informed or advised as to whether or not the defendant, Yant, and the defendant, Decker, and the other individual Barbara Reasor, had been placed under arrest at that time?

"A. Yes, I asked Lieutenant Cline specifically if they had been arrested and he advised that Officer Mascoe and Officer Dunkin had placed these defendants under arrest and pointed out to me that they were in custody of the police officers in these three separate cars. I asked him to what extent the search of the vehicle had proceeded. He said it had just proceeded to the point where a .45 pistol had been removed from beneath the right front seat of the car. He showed me the pistol and showed me a woman's purse that had a bunch of miscellaneous objects, including some rolled coin in the purse—six rolls of pennies and one roll of dimes, to be specific, and a little plastic box that had a silver dollar in it minted in 1923. At this time we continued with the search of the car. The search of the car disclosed a purchaser's stub from a money order issued away back in 1959 at Barrier, Kentucky; disclosed quite a few items of men and women's clothing. Among them was a pair of blue peddle pushers, women's peddle pushers, which were blood-stained fairly significantly on the right side; a .22 caliber H & R re-

volver, nine shot, was found in the right front door of this vehicle. These objects were kept in the custody of the police until we went to police headquarters. In view of the fact that the front seat of the car had the upholstery torn out on the righthand side, and I had previous information that Mr. Duckworth had been wounded, and in view of the fact that blood stains were on the peddle pushers, I asked Lieutenant Cline to seize the entire car as evidence and to have it towed to police headquarters. There is a garage in the basement of police headquarters—which he did.

"Q. 10. Now who removed the .22 caliber pistol from the car?

"A. I did, sir.

"Mr. Cook: I ask that the witness be shown Exhibit No. 7.

"Q. 11. Can you identify that, Mr. Freeman?

"A. Yes, sir. This is the .22 caliber revolver that I removed from that vehicle. I have identified this weapon by placing my initials, G. F., and date, 1-14-65, on the metal part of the butt.

"Q. 12. Did you see the .45 caliber pistol at that time?

"A. Yes, sir, I did.

"Mr. Cook: Let the witness see Exhibit No. 6, please.

"Q. 13. Can you identify that, Mr. Freeman?

"A. Yes, sir. This is the pistol without the clip. It had a clip in it at that time, the regular clip that goes in the butt part of the weapon. This is the weapon that I was shown. I did not remove this weapon from the car as in the case of the .22. I placed my initials on the right side of the grip of this weapon, G. F. 1-14-65. It had a clip that had four live rounds in it at the time that I first saw it."

■ Appellants' brief and oral argument accepted the essential facts which we have just recited from Inspector Freeman's testimony for purposes of the Fourth Amendment issue. By saying this we do not fail to note that defendants themselves in their testimony before the jury denied any participation in the armed robbery of Mrs. Denney or the assault upon Mr. Denney, and likewise denied ever having seen the .22 revolver which Inspector Freeman claimed he found in the right front door of the car. Yant also testified that he had himself pulled the .45 automatic out from under the seat and given it to the arresting officer. These conflicts of evidence, however, were principally for the jury's consideration and they have been resolved against the defendants, as the jury had a right to resolve them.

Our review of the search is made primarily against the standards set forth in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). In this case Mr. Justice Black, for the Court, set forth the following rule:

"It is argued that the search and seizure was justified as incidental to a lawful arrest. Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. Weeks v. United States, 232 U.S. 383, 392, [34 S.Ct. 341, 344, 58 L.Ed. 652] (1914); Agnello v. United States, 269 U.S. 20, 30, [46 S.Ct. 4, 5, 70 L.Ed. 145] (1925). This right to search and seize without a search warrant extends to things under the accused's immediate control, Carroll v. United States, supra, 267 U.S., [132] at 158, [45 S.Ct. 280, at 287, 69 L.Ed. 543] and, to an extent depending on the circumstances of the case, to the place where he is arrested, Agnello v. United States, supra, 269 U.S., at 30, [46 S.Ct. [4] at 5]; Marron v. United States, 275 U.S. 192, 199, [48 S.Ct. 74, 77, 72 L.Ed. 231] (1927); United States v. Rabinowitz, 339 U.S. 56, 61–62, [70 S.Ct. 430, 433, 94 L.Ed. 653] (1950). The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other

things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime— things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. Agnello v. United States, supra, 269 U.S., at 31 [46 S.Ct. at 5, 70 L.Ed. 145.] Here, we may assume, as the Government urges, that, either because the arrests were valid or because the police had probable cause to think the car stolen, the police had the right to search the car when they first came on the scene. But this does not decide the question of the reasonableness of a search at a later time and at another place." Preston v. United States, supra at 367–368, 84 S.Ct. at 883.

■ We believe that the facts in our instant case fall well outside of the *Preston* rule which we have quoted above. Clearly the arrests in the instant case were lawful arrests, based upon prior knowledge of a felony committed, and probable cause to believe that appellants committed it. In addition, judicial warrants had been issued for the persons actually identified and seized. The search which produced the .45 automatic, as well as the search which produced the .22 revolver, were not in our view "remote in time or place from the arrest."

Under the circumstances of this case, the officers arresting had need to be concerned about searching for weapons which might endanger their own safety or permit the escape of the defendants. In addition, they had reason to be concerned about searching for the fruits of the crime. See Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

We are not confronted here, as the Tenth Circuit was in Sirimarco v. United States, 315 F.2d 699 (C.A. 10, 1963), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963), with a search of a lawfully seized automobile conducted the next day following the lawful arrest of its owner.

■ We specifically reject the suggestion advanced by appellants that the fact that the warrants were issued by a state court and that the original arrest was by local police officers prohibited the Federal officers concerned with the basic underlying federal crime from lending their cooperation both to the arrest and to the search when they were on the scene of the lawful arrest, contemporaneously with the search.

■ State and federal law enforcement were mutually concerned here about a single criminal episode which violated both state and federal law. Cf. Simpson v. United States, 346 F.2d 291 (C.A. 10, 1965). Such effective cooperation between law enforcement agencies is by no means unconstitutional. In Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the United States Supreme Court said:

"Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged." Elkins v. United States, supra at 221, 80 S.Ct. at 1446.

Affirmed.